UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR No. 3:96-358-JFA |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| TERRY CHARLES JENKINS | ) | |
| _____ | ) | |

This matter is before the court on defendant's motions for a reduction in his sentence pursuant to the First Step Act of 2018 (FSA) (ECF Nos. 1007, 1034).[1] He raises claims under two separate components of the FSA. First, the defendant contends that he is eligible for a reduction in his sentence pursuant to § 404(b) of the First Step Act because one of his convictions of record involved crack cocaine. Second, he contends that he is entitled to compassionate release under § 603(b) of the First Step Act because of his advanced age and physical infirmities.[2]

The government has responded and acknowledges that the defendant is eligible for relief pursuant to § 404(b). The government also concedes that the defendant presents an extraordinary and compelling reason in support of his motion for compassionate release due

---

[1] In an order filed July 8, 2021, the Fourth Circuit, upon the unopposed motion of the parties, vacated the district court's March 24, 2020 order (ECF No. 1021) and remanded the matter to the district court for reconsideration in light of *United States v. McDonald*, 986 F.3d 402 (4th Cir. 2021) which this court did not have the benefit of when it issued its order. *See United States v. Jenkins*, No. 20-6505, July 6, 2021. In *McDonald*, the Court found that the district court did not properly consider the defendant's post-sentencing mitigation evidence.

[2] In its order of March 24, 2020, the court denied the defendant's motion for compassionate release because the defendant had not exhausted his administrative remedies at the time.

1

to his age and medical conditions. However, the government opposes both motions as a result of the defendant's underlying criminal conduct, his conduct while incarcerated, and the statutory sentencing factors under 18 U.S.C. § 3553(a).

The court has carefully considered the record before it and conducted an individualized analysis of the facts and issues raised by the parties. The defendant's motions for compassionate release and § 404(b) are granted in part, and are discussed below in turn.

    A.  <u>Motion for Compassionate Release under § 3582(c)(1)(A)</u>

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492 (4th Cir. 2020); *United States v. Martin,* 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *See Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. It was originally adopted as part of the Sentencing Reform Act of 1984.

On December 21, 2018, the First Step Act was signed into law. Broadly, the Act's goals were to reform federal prisons and sentencing laws to reduce recidivism, decrease the federal inmate population, and maintain public safety. The First Step Act also expanded the

existing compassionate release provisions of federal law by allowing an inmate to move for compassionate release himself, rather than allowing only the Director of the Bureau of Prisons (BOP) to do so.  The relevant portion of the First Step Act, codified at 18 U.S.C. § 3582(c)(1)(A), as amended by § 603(b) of the First Step Act, provides:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) [of Title 18] to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

By its terms, § 3582(c)(1)(A) permits the court to reduce the defendant's term of imprisonment after considering the factors set forth in  18 U.S.C. § 3553(a) if the court first finds that (i) extraordinary and compelling reasons warrant such a reduction; and (ii) such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.  In addition, a district court may not grant a sentence reduction under § 3582(c)(1)(A) without considering the § 3553(a) factors to the extent they are applicable. *United States v. Kibble*, 992 F.3d 326, 332 (4th Cir. 2021).

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), the Fourth Circuit agreed with the Second Circuit in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) and found that there is, as of now, no "applicable policy statement governing compassionate release

motions filed by defendants under the recently amended § 3582(c)(1)(A)," and as a result, district courts are "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise." *McCoy*, 981 F.3d at 284 (citing *Brooker*, 976 F.3d at 230); *see also*, *Kibble*, 992 F.3d at 331.

A defendant's rehabilitation standing alone does not provide sufficient grounds to warrant a sentence modification. 28 U.S.C. § 994(t). Also, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court generally proceeds in three steps. *See United States v. High*, 997 F.3d 181, 185–86 (4th Cir. 2021). First, the court determines whether "extraordinary and compelling reasons" support a sentence reduction. Next, the court considers whether a sentence reduction is consistent with applicable policy statements issued by the Sentencing Commission. As noted previously in this order and as set out in *McCoy*, because there is no applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A), district courts are empowered to consider any extraordinary and compelling reason for release that a defendant might raise. Finally, if the court finds that extraordinary and compelling reasons warrant relief, the court must consider the § 3553(a) factors in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment.

Before a court may consider a defendant's motion for compassionate release, the defendant must have fully exhausted all of the administrative rights to appeal a failure of the Bureau of Prisons (BOP) to bring a motion on the defendant's behalf or the lapse of 30 days with no answer from the Warden after a request by the defendant, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). The government concedes that the defendant has fully exhausted his administrative remedies, therefore, the court will proceed to review the matter on the merits.

Even if the defendant meets the eligibility criteria for compassionate release, this court retains discretion as to whether to grant relief. *See* 18 U.S.C. § 3582(c)(1)(A) (providing the court *may* reduce the term of imprisonment) (emphasis added).

The mere existence of the COVID-19 pandemic—which poses a threat to every non-immune individual in the world—cannot independently provide a basis for a sentence reduction or justify compassionate release. However, COVID-19 is certainly relevant to the court's analysis of a § 3582(c)(1)(A) motion for compassionate release. If a defendant has a chronic medical condition that has been identified by the Centers for Disease Control (CDC) as elevating an inmate's risk of becoming seriously ill from COVID-19, it is possible that such medical condition could satisfy the extraordinary and compelling reasons standard. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

5

Rather, the threshold questions are whether the defendant has a particularized risk of contracting COVID-19 in prison and whether his medical conditions render him particularly susceptible to severe illness or death should he contract the virus. *See United States of America, v. Andre Youngblood*, No. 20-7836, 2021 WL 4167105, at *2 (4th Cir. Sept. 14, 2021) (citing *United States v. High*, 997 F.3d 181, 185 (4th Cir. 2021)).

*The Defendant's Medical Conditions*

The defendant is currently 70 years of age and, according to BOP records, is suffering from severe dementia, with a current diagnosis indicated as "dementia with behavioral disturbance." He also has deficits in auditory processing, primary memory, attention, and learning. According to the defendant, his BOP medical records confirm that he often misses meals and is confused at times; he is also no longer able to manage his own medication; and he is barely able to manage his activities of daily living with assistance. He suffers from an unknown prostate disorder with a persistently high PSA level. Because he has missed many meals due to his dementia, he has lost 16 pounds since 2020.

The defendant has also been diagnosed with hypertension, hyperlipidemia, chronic viral hepatitis B and C, type 2 diabetes, a prostate disorder with concerning PSA levels, and a recent CT scan showed cerebral infarctions.

As noted previously, the government concedes that the defendant's medical conditions constitute an extraordinary and compelling reason in support of his motion for compassionate release. This court agrees.

6

Before the court delves into a review of the defendant's § 3553(a) factors, the court will next address the defendant's motion under § 404(b).

B.  Motion Under § 404(b) of the First Step Act

Section 404(b) of the First Step Act of 2018 relates to crack cocaine offenses and retroactive application of the Fair Sentencing Act of 2010.

The First Step Act of 2018 was signed into law on December 21, 2018.[3]  One of the changes in the Act relates to the Fair Sentencing Act of 2010[4] which, among other things, reduced statutory penalties for cocaine base ("crack") offenses.[5]  Specifically, § 404 of the First Step Act retroactively applies the reduced penalties under the Fair Sentencing Act to "covered offenses" committed *before* August 3, 2010.

The court that imposed a sentence for a covered offense may on its own or on a motion of the defendant, the Director of the Bureau of Prisons, or the attorney for the government, impose a reduced sentence as if the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed.  A court may not entertain a motion to reduce a sentence if the sentence was previously imposed or reduced in accordance with the

---

[3]  Pub. L. 115-015 (S. 756), 132 Stat. 015 (enacted Dec. 21, 2018).

[4]  Pub. L. 111-220; 124 Stat. 2372 (2010).

[5]  Effective August 3, 2010, the Fair Sentencing Act reduced the amount of cocaine base needed to trigger certain statutory minimum and maximum sentences.  *See* 21 U.S.C. § 841(b)(1)(A)(iii) (raising from 50 to 280 grams the amount of cocaine base needed to trigger statutory range of 10 years to life in prison); 21 U.S.C. § 841(b)(1)(B)(iii) (raising from 5 to 28 grams the amount of cocaine base needed to trigger statutory range of 5 to 40 years in prison).

amendments made by the Fair Sentencing Act of 2010 or if a previous motion to reduce the sentence was denied after a complete review of the motion on the merits. Finally, nothing in the First Step Act shall be construed to require a court to reduce any sentence based on the First Step Act's retroactive application of the Fair Sentencing Act of 2010.

The mechanism for bringing a First Step Act motion is found at 18 U.S.C. § 3582(c)(1)(B), which states that a "court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute." *United States v. Wirsing*, 943 F.3d 175 (4th Cir. 2019). This court's authority for granting an FSA motion is broad. Under this provision, "there is no limiting language to preclude the court from applying intervening case law" when evaluating an FSA motion. *United States v. Chambers*, 956 F.3d 667, 672 (4th Cir. 2020). Furthermore, 18 U.S.C. § 3553(a) "sentencing factors apply in the § 404(b) resentencing context." *Id*. at 674. Finally, "the resentencing court has discretion within the § 404(b) framework to vary from the Guidelines and, in doing so, to consider movants' post-sentencing conduct." *Id*.

It does not automatically follow, however, that the sentence must be reduced. Indeed, the First Step Act indicates, in two different sections, that any relief awarded is discretionary with the sentencing court. Under § 404(b) of the First Step Act, the court "may," but is not required to, grant statutory relief. The discretionary nature of the relief is further emphasized in § 404(c) of the First Step Act. Building on the "may" language in § 404(b), this section provides that "nothing in the section is to be construed to require a court to reduce any

8

sentence" under the Act.

In *United States v. Collington*, 956 F.3d 347 (4th Cir. 2021), the Fourth Circuit clarified three steps that a district court must take when considering a request for relief under § 404(b): (1) accurately recalculate the Guidelines sentence range; (2) correct original Guidelines errors and apply intervening case law made retroactive to the original sentence; and (3) consider the § 3553(a) factors to determine what sentence is appropriate. Thus, a district court must consider a defendant's arguments, give individual consideration to the defendant's characteristics in light of the § 3553(a) factors, determine—following the Fair Sentencing Act—whether a given sentence remains appropriate in light of those factors, and adequately explain that decision.

The Fourth Circuit also clarified in *United States v. Lancaster*, 997 F.3d 171 (4th Cir. 2021) that a First Step Act proceeding is not intended as a plenary resentencing or complete or new relitigation of Guideline issues or § 3553(a) factors. Rather, the court must look at the gaps left from the original sentencing to determine what sentence it would have imposed under the Fair Sentencing Act in light of intervening circumstances.

PROCEDURAL HISTORY

*The Offense Conduct*

The Presentence Report (PSR) (ECF No. 1013) provides the following summary of criminal offenses:

While on routine patrol on May 18, 1995, a deputy sheriff of the Calcasieu Parish Sheriffs Office in Louisiana effected a traffic stop on a 1985 Lincoln Continental. This traffic stop took place on Interstate 10. The vehicle was driven by Linda Jones Biggs and the passenger was her son, Timothy Ray Galloway. The vehicle did not have a license plate and it was a rental vehicle. According to the rental agreement, the vehicle should have had a license tag. The deputy first questioned Ms. Biggs outside the vehicle. He then questioned the passenger, Timothy Galloway. Their stories did not match as to where they were going, when they were returning and the information on the rental agreement.

The officer became suspicious and asked for permission to search the vehicle. During the search of the vehicle, the officer found a .25 caliber Titan semiautomatic handgun and $11,000 in cash hidden in various places in the vehicle and two (2) blank checks on a T.C. Jenkins account. The deputy asked Ms. Biggs if she would follow him to the Sheriff's Office.

The defendants were interviewed separately by deputies at the Sheriff's Office. Ms. Biggs answers were inconsistent with evidence found in the vehicle and she was visibly shaken. One of the deputies asked Ms. Biggs to tell him the truth. Ms. Biggs lowered her head and stated she did not smoke marijuana. The deputy then asked Ms. Biggs if she was going to Texas to acquire marijuana. Ms. Biggs replied she was unaware of the exact amount of marijuana which she was going to purchase but stated she had purchased approximately fifteen (15) pounds of marijuana in the Houston area on a previous occasion. Ms. Biggs related she and her son had been sent to Houston to purchase marijuana by T.C. Jenkins, a resident of Columbia, South Carolina area, for whom she and her son had been employed. Ms. Biggs stated she was to receive $1,200 for transporting the marijuana and her son was to receive $1,500 for his part in transporting the contraband. Tim Galloway collaborated all the admissions made by his mother, including the amount of money they were to be paid by T.C. Jenkins.

Law enforcement officials of the Calcasieu Parish Sheriff's Office contacted United States Custom Service Special Agent Mike Daigle, Lake Charles, Louisiana. Special Agent Daigle interviewed Ms. Biggs and Mr. Galloway. Believing this to be a large drug conspiracy involving multiple states, a joint investigation with the Calcasieu Parish Sheriff's Office, Department of the Treasury, United States Customs Service; Department of Justice, Drug Enforcement Administration and the Houston Texas Police Department was

initiated. The investigation led to the arrest of Jose Hernandez, Terry Charles Jenkins, Sharon Jenkins, Carolyn Trice, Larry Jenkins, Jim Batie, Harry Lee Renwick, Drew Coleman, David Spradley, Linda Biggs, and Tim Galloway. The following is an account of this defendant's participation in the conspiracy:

Terrence Charles Jenkins was the organizer and leader of a large drug distribution ring in Columbia, South Carolina. This drug organization distributed marijuana, cocaine and "crack cocaine." The organization consisted of the defendant, Sharon Jenkins, Carolyn Tice, Larry Jenkins, Jim Batie, Harry Lee Renwick, Drew Coleman, David Spradley, Linda Biggs, Tim Galloway and others. The defendant was getting a major portion of his drugs from Jose Hernandez. Mr. Hernandez testified at trial he had been selling Mr. Jenkins marijuana and cocaine for approximately three (3) years. He testified on average someone from the Jenkins organization made a trip to Texas twice a month and purchased an average of thirty (30) pounds of marijuana on each trip. In addition to the marijuana, Hernandez testified he sold Jenkins at least four (4) kilograms of cocaine powder. Hernandez testified Jenkins liked the yellow cocaine he had gotten because it was better for "rocking it up." (Jenkins would convert the cocaine powder to "crack cocaine.") Jenkins confessed to Drug Enforcement Agents (DEA) he had purchased approximately twelve (12) kilograms of powder cocaine from Hernandez. Witnesses testified in Court Jenkins dealt mostly in "crack cocaine." Harry Lee Renwick testified he had bought a total of approximately five (5) cookies of "crack cocaine" (approximately twenty-eight [28] grams) from Jenkins. Felton Brown testified Andre Weston sold at least a 1/4 ounce of "crack cocaine" to Jenkins on the average of twice a week. Weston would often get marijuana from Jenkins in exchange for "crack cocaine." On one occasion, Freddie Bouknight testified he delivered a 1/4 ounce of "crack cocaine" to Jenkins while Weston was out of town.

On October 31, 1995, Jenkins was having financial problems and arranged a marijuana transaction with Weston. According to Jasmine Saygidia and Tamara Rivera, Jenkins had Rivera drive him and Weston to the location where Jenkins claimed the marijuana was stored. They drove an old station wagon that Jenkins had purchased for Rivera. Jenkins lead Rivera to believe they were going to do a marijuana deal with Weston. Weston sat in the front passenger's seat while Jenkins sat in the back seat. Jenkins directed Rivera to several areas throughout Richland and Lexington County. According to Jasmine Saygidia, Rivera's mother, she followed behind in her car. Jenkins instructed Rivera to drive so Jenkins could pick up his stash. At one location,

11

Jenkins had Rivera stop so he could get in the car with Saygidia. Jenkins instructed Saygidia to drive away. When out of site from Rivera and Weston, Saygidia saw Jenkins grab a cardboard box from the back of her car. When Jenkins returned to Rivera and Weston, he indicated that "he had it" (implying the marijuana) and instructed Rivera to drive him and Weston to another unknown location. While in route to the other location, Jenkins pulled a revolver and shot Weston five (5) times in the back of the head. Jenkins ordered Rivera to drive down a dirt road and park. After Rivera stopped the car, Jenkins searched Weston's body and recovered two (2) to three (3) cookies of "crack cocaine" and a large sum of cash. Jenkins pulled Weston's body out of the car and left it in some nearby woods. Jenkins then made Rivera drive to the Lake Murray Dam where he tossed the gun.

In summary, the defendant was an organizer and leader of a drug conspiracy in the Columbia, South Carolina area. This was a large drug network which distributed an excess of 2 kilograms of cocaine base and thousands of pounds of marijuana. According to the defendant's own estimate, he distributed at least 12 kilograms of cocaine base. The defendant assassinated one of his accomplices and stole cash and "crack cocaine" from his dead body. (ECF No. 1013, PSR at 3–5).

*Criminal Charges*

On April 22, 1997, a federal grand jury charged the defendant in a Second Superseding Indictment (ECF No. 249) with the following criminal violations:

Count 1:    conspiracy to possess with intent to distribute and distribute cocaine base and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(a) and 18 U.S.C. §§ 846 and 2;

Count 2:    possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D) and 18 U.S.C. § 2;

Count 3:    felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(d), 924(a)(2) and 18 U.S.C. § 2;

>    Count 4:     felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(d), 924(a)(2) and 18 U.S.C. § 2;
>
>    Count 8:     murder during and in relation to a drug trafficking crime in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; and
>
>    Count 9:     murder while carrying and using a firearm during and in relation to a drug trafficking crime; in violation of 18 U.S.C. § 924(I)(1) and 18 U.S.C. § 2.

The defendant pleaded not guilty to these charges. Following a seven-day jury trial, a jury unanimously found the defendant guilty on all counts on October 23, 1997.

Using the then-applicable version of the Guidelines Manual, the United States Probation Office (USPO) prepared a Presentence Report (PSR) to which the defendant did not object. The PSR used Counts 1, 2, 3, 4, 8, and 9 to calculate the defendant's guideline sentence. Significantly, United States Sentencing Guideline (USSG) § 2D1.1(d)(1)—commonly referred to as the "murder cross reference"—primarily drove the defendant's sentence. This Guideline resulted in a base offense level of 43. The defendant then received a 4-level increase for his role in the offense, and an additional 2 levels for obstruction of justice, for a total offense level of 49. However, under the Guidelines, an offense level more than 43 is treated as 43, thereby causing the defendant's offense level to become 43. The defendant's criminal history category was II. This total offense level and criminal history score resulted in a Guideline sentence of life.

On February 19, 1998, Judge C. Weston Houck[6] held a sentencing hearing. After first determining that the defendant did not have any objections to the PSR, Judge Houck imposed the Guideline sentence of Life in this case. Supervised release was set at 5 years.

*Recalculation of the Guidelines Range*

Although the statutory minimum for the defendant's drug convictions have been altered by the Fair Sentencing Act of 2010, his Guideline calculations remain the same today because as noted above, the murder cross reference—not the drug weights—drove his Guideline calculations. The defendant's supervised release exposure is now 3 to 5 years.

## IV.  ANALYSIS

As noted earlier, the court has determined that the defendant has presented an extraordinary and compelling reason for compassionate release. Having made this determination, the court will now turn to the § 3553(a) factors to determine if the defendant's immediate release from custody would be appropriate.

Next, the court must determine, in light of the recalculated Guidelines sentence in connection with the defendant's § 404(b) motion, what the defendant's new term of supervised release will be.

---

[6] The defendant was arrested and charged in the District of South Carolina with drug conspiracy and distribution, various firearms counts, and murder. The case was assigned to Judge Houck who conducted a trial in October 1997 after which the jury returned a verdict of guilty on all counts. Judge Houck has passed away and the matter has been assigned to this court for consideration of the defendant's motions for relief under the First Step Act.

*Factors Under § 3553(a)*

1. *Nature and Circumstances of the Offense.* It cannot be gainsaid that the defendant committed a particularly heinous crime. The defendant was at the top of a pyramid that involved extensive importation and distribution of all three types of controlled substances, including crack cocaine. The quantities involved were significant—from 1990 to 1996 the drug trafficking organziation distributed more than 2 kilograms of cocaine base, and 1,000 pounds of marijuana.

In addition, the defendant assassinated one of his accomplices by shooting him 5 times in the back of the head and close range. He then stole a quantity of cocaine base and a large sum of cash from his accomplices's body before disposing of it. He also obstructed justice by making credible threats to kill a co-defendant if he signed any statements or testified against Jenkins. And, shortly before trial, when the defendant and one of his co-defendants were housed at the same jail, the defendant physically attacked his co-defendant who was to be a witness against him at trial.

2. *History and Characteristics of Defendant.* The defendant was 48 years old when he committed the instant crimes. He is now approximately 72 years old and is serving his life sentence at the Federal Correctional Institution in Jesup, Georgia.

The PSR sets out in detail the defendant's characteristics, as well as his criminal history and past convictions going back to 1968 to include possession of dangerous drugs, grand larceny, burglary, and common law robbery. The PSR prepared in 1997 is somewhat

sparse with regard to the defendant's personal and family data. The defendant reported that he graduated from high school in Brooklyn New York in 1966, but such information was not verified. His listed employment was that of a truck driver.

During the more than 25 years he has been incarcerated at the BOP, the defendant has accumulated 5 disciplinary infractions[7] that include use of drugs/alcohol in 2014 (100-level); possessing gambling paraphernalia in 2007 (300-level); exchanging money for contraband (200 level) and using phone or mail without authorization (200 level) both in July 2000. The most recent violation was in October 2020 where the defendant was sanctioned for interfering with staff (200-level).

The government notes that the defendant has spent decades in prison and has presented significant evidence regarding his attempts at rehabilitation using the resources available to him at the BOP. He has participated in the BOP psychology services. He has obtained his GED and participated in parenting and Spanish classes, and teaching in the BOP adult continuing education program.

In regard to his release plans, the defendant has two daughters who reside close to each other in Houston, Texas. One is a nursing student who works at a hospital and will be able to get him medical care as he needs it. The defendant has 6 grandchildren that the daughter says have a close relationship with the defendant, even though they have never seen him outside of prison. The other daughter lives in Houston with her husband and owns her

---

[7] According to the BOP, 100-level offenses are the most serious; 200-level offenses are moderately serious; and 300-level offenses are the least serious.

own business. She is willing to care for her father, along with their sister and older brother who is also a business owner.

     3. *Seriousness of the Crimes*. As evidenced by the historical facts set out in the PSR involving the defendant, this court regards the defendant's crimes as very serious, fully supportive of a significant sentence.

     4. *Whether the Sentence Promotes Respect for the Law and Just punishment for the offense*. The court finds a significant sentence is necessary to promote respect for the law and just punishment.

     5. *Whether the Sentence Affords Adequate Deterrence to Criminal Conduct*. The court finds that a significant sentence is necessary to provide both general and specific deterrents.

     6. *Whether the Sentence Protects the Public from Future Crimes of the Defendant*. The court finds that a significant sentence is necessary to protect the public from future crimes of the defendant.

     7. *Need to Avoid Unwarranted Sentencing Disparities*.
Given that mandatory minimums drove the defendant's sentencing, the defendant's sentence was fully in line with similarly situated defendants at the time it was issued.

## V. CONCLUSION

It can thus be seen that the defendant committed serious and grave criminal acts. Those acts are deserving of a substantial sentence. But, in this court's view, the 25-year

sentence the defendant has already has served is sufficient, but not greater than necessary to serve the purposes of sentencing. This is true especially considering his current health and his plan of release. Defendant's continued incarceration would only burden an already overworked prison system. This court believes that the defendant has paid his debt to society and that keeping him in custody for the foreseeable future would be a burden on taxpayers.

The court concludes that the defendant has demonstrated an extraordinary and compelling reason for relief under § 3582(c)(1)(A) and that his release at the present time would not present a danger to the public. The court reaches this conclusion after carefully considering the individualized circumstances of the case, and after considering the § 3553(a) factors. Accordingly, the defendant's motion for compassionate release is granted.

As to the defendant's § 404(b) motion, the court has reviewed the Guidelines and determined that although the statutory minimum for the defendant's convictions were affected by the Fair Sentencing Act, his Guideline calculations remain the same today due to the murder cross reference of USSG § 2A1.1 which drove his Guideline calculation, not the drug weights. However, the defendant's term of supervised release is eligible for a reduction from 5 years to 3 years. The defendant's motion pursuant to § 404(b) is granted in part.

The defendant's previously imposed life sentence is reduced to time served. The defendant's term of supervised release is now 3 years. All other provisions of the original judgment remain in full force.

This order shall be stayed for a period of 14 days to allow the BOP to attend to the paperwork necessary to accomplish the defendant's release.

IT IS SO ORDERED.

*Joseph F. Anderson, Jr.*

October 7, 2021
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge